NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11346

COMMONWEALTH  vs.  LESLIE COLE.


Bristol.     October 9, 2015. - December 18, 2015.

Present:  Gants, C.J., Spina, Botsford, Lenk, & Hines, JJ.


Homicide.  Evidence, Medical record, Consciousness of guilt,
     Hearsay, Expert opinion.  Deoxyribonucleic Acid.  Witness,
     Expert.  Constitutional Law, Confrontation of witnesses.
     Practice, Criminal, Capital case, Hearsay, Instructions to
     jury, Confrontation of witnesses, Discovery, Argument by
     prosecutor, Required finding.


     Indictments found and returned in the Superior Court
Department on March 3, 2006.

     The cases were tried before Robert J. Kane, J.


     James E. Methe for the defendant.
     Mary O'Neil, Assistant District Attorney, for the
Commonwealth.


     SPINA, J.  A Superior Court jury convicted the defendant,

Leslie M. Cole, of the murder in the first degree of Rudolph

Santos (victim) on theories of deliberate premeditation, extreme

atrocity or cruelty, and felony-murder, in violation of G. L.

c. 265, § 1.[1]  On appeal, the defendant contends that (1) the trial judge erred by admitting in evidence unredacted medical records purportedly belonging to the defendant, together with related testimony from a nurse practitioner, and by instructing the jury on consciousness of guilt; (2) the admission of expert testimony concerning the statistical significance of deoxyribonucleic acid (DNA) evidence violated the defendant's constitutional right to confront witnesses; (3) the trial judge erred by admitting in evidence the victim's T-shirt, notwithstanding a purported discovery violation by the Commonwealth; (4) the prosecutor made improper remarks during her opening statement and her closing argument; and (5) the judge erred in denying the defendant's motion for required findings of not guilty.  The defendant also requests that we exercise our authority under G. L. c. 278, § 33E, to reduce the conviction of murder to a lesser degree of guilt or to order a new trial.  For the reasons detailed below, we affirm the defendant's convictions and decline to grant relief pursuant to G. L. c. 278, § 33E.

---

[1] The jury also convicted the defendant of the assault of Christopher Busby by means of a dangerous weapon (knife), in violation of G. L. c. 265, §  15B (b); armed robbery, in violation of G. L. c. 265, § 17; and home invasion, in violation of G. L. c. 265, § 18C.  The jury found the defendant not guilty of assaulting Busby with the intent to murder.

1. Background.  We summarize the facts the jury could have found, reserving further details for our discussion of the alleged errors.

Shortly before Christmas in 2005, the defendant and William Fields, who sold drugs together, discussed the possibility of robbing an unspecified drug dealer in order to resolve a cash flow problem.  One day when the two men were visiting the New Bedford home of Fields's friend, Shannon Almeida, they asked her if she knew anyone who had a gun.  Almeida responded that she did, and she introduced them to Vincent Wadlington.  On the evening of December 24, while at Almeida's house, the defendant, Fields, and Wadlington discussed plans to commit a robbery.  They then drove to an apartment in Brockton, where Wadlington retrieved a sawed-off rifle and some ammunition.  The three men drove back to New Bedford, stopping at another house so the defendant could get some dark clothes to wear.  At around 10 P.M., the defendant, Fields, and Wadlington returned to Almeida's home, and, approximately ninety minutes later, they decided that they were "ready to go and do this."  The three men traveled in the defendant's motor vehicle to a multifamily home on Hillman Street, parked nearby, put on gloves and masks, walked to the house, and approached the back door.  Wadlington was carrying the rifle.

That night, Christopher Busby was at home in that Hillman Street residence, spending time with his friend, the victim. The two men sold drugs from Busby's apartment, typically to people they already knew. They kept larger quantities of their supply in the cellar, which was always locked. The victim had possession of the key that night.

Sometime before midnight, Wadlington knocked on the apartment's door. In response to Busby's inquiry about who was there, Wadlington replied that it was "Eddie," but neither Busby nor the victim recognized the voice. Busby told "Eddie" to step near a window so he could see his face. Wadlington complied with the request, and he handed the rifle to the defendant. Busby did not recognize "Eddie," told the man that he would not sell him any drugs, and watched him walk away from the apartment. Several minutes later, Busby started to open the door so he could look outside. The defendant, Wadlington, and Fields kicked the door and rushed into the apartment.

The defendant fought with Busby. As Busby tried to defend himself, he felt someone striking him from behind, and he turned to see Fields hitting him with a metal pipe. Wadlington fought with the victim. Shortly after the altercation began, Fields left the apartment, returned to the defendant's vehicle, drove to a nearby house, knocked on the front door, and asked the man

who answered to call the police because he had heard gunshots.[2] Fields then drove the vehicle back to where the three men originally had parked it, and he fled the scene on foot.

Meanwhile, back at the apartment, Busby was stabbed multiple times with a knife before collapsing and passing out. When he regained consciousness, he heard men's voices in the kitchen questioning the victim about the location of the drugs and demanding the key to the cellar. Busby quickly grabbed a Samurai sword that was leaning against a wall in the kitchen, swung it at the two assailants, and stabbed one of the men in the leg. After fighting with someone as he made his way down a hallway, Busby managed to reach his bedroom, where he fell onto the bed. He had difficulty breathing and was bleeding. Busby still could hear voices from the kitchen, and he realized that the victim had surrendered the key to the cellar when he heard one of the men running down the cellar stairs and back up again, asking, "Where are the drug[s]? Where are the drugs, Ru?" Busby then heard the sound of a gunshot and someone saying, "It's only a .22 rifle." The next thing Busby remembered was being treated by a paramedic.

---

[2] William Fields testified that he had not actually heard gunshots, but that he said he did in the hope that emergency personnel would respond to the scene more quickly. Fields testified pursuant to a cooperation agreement by which, in return for his testimony, the Commonwealth agreed to allow him to plead guilty to lesser charges, and to receive a more favorable sentence.

Shortly before 1 A.M. on December 25, New Bedford police Officer Barry Pacheco and Sergeant Francis Rodriques arrived at the Hillman Street residence. After entering the apartment, which was in complete disarray, they observed a man lying on the floor, showing no signs of life. They then heard yelling from another room and discovered Busby lying face down on a bed, covered in blood, saying that he had been stabbed. Paramedics soon arrived and determined that the victim was dead. Busby, who had puncture wounds all over his body, was transported to a hospital and subsequently spent a week in a different hospital recovering from numerous stab wounds. State police criminalists processed the crime scene, including the stairs and walls leading down to the cellar, and collected evidence.

Following the events at Busby's apartment, Fields eventually returned to Almeida's home where he encountered the defendant, who had a bloody cloth wrapped around his thigh. When Fields asked the defendant what had happened to his leg, the defendant replied, "Well, you know, this is what happened in the house." The defendant left Almeida's home at around 6 A.M. on December 25. That same day, an individual named "Derrick Williams" was treated in the emergency room of Rhode Island Hospital (hospital) for a laceration to his thigh. A few days later, Fields looked in the trunk of the defendant's car and saw what appeared to be a Samurai sword, along with the clothes that

the defendant had worn on the night of the assault.  The two men drove to the docks located in the south end of New Bedford and threw the items in the ocean.

Dr. William Zane, a medical examiner for the Commonwealth, performed the autopsy on the victim.  He testified that the victim had a gunshot wound to his right cheek, lacerations to his left upper eyelid and lower lip, contusions to his left cheek and forehead, abrasions on his right cheek and jaw, a gaping cut on the back of his left hand that went to the bone, cuts to his right wrist and forearm, and an eight-inch deep stab wound to his left buttock.  Dr. Zane concluded that the victim died from the gunshot wound to his head, which penetrated his brain.  He further concluded that a contributing factor in the victim's death was the stab wound to his buttock, which penetrated his lower abdominal cavity.

2.  <u>Admission of medical records, related testimony, and instruction on consciousness of guilt</u>.  The defendant first contends that the judge should not have allowed medical records from the hospital to be admitted in evidence because there was no foundational showing that the defendant was the same person who was treated at the hospital.  The defendant objected to the judge's ruling, so we review any error in the admission of the medical records under the prejudicial error standard.  See <u>Commonwealth</u> v. <u>Flebotte</u>, 417 Mass. 348, 353 (1994).

General Laws c. 233, § 79, excepts certain hospital records from the common-law rule against hearsay evidence. See Commonwealth v. Francis, 450 Mass. 132, 139 (2007); Bouchie v. Murray, 376 Mass. 524, 527 (1978). The statute provides that "[r]ecords kept by hospitals . . . under [G. L. c. 111, § 70,] shall be admissible . . . as evidence . . . so far as such records relate to the treatment and medical history of such cases." G. L. c. 233, § 79. See Mass. G. Evid. § 803(6)(B) (2015). Section 79 was enacted to relieve medical personnel from "the hardship and inconvenience of attending court as witnesses to facts which ordinarily would be found recorded in the hospital books." Commonwealth v. Gogan, 389 Mass. 255, 263 (1983), quoting Leonard v. Boston Elevated Ry., 234 Mass. 480, 482 (1920). See Francis, supra. "More importantly, however, the statute allows admission of the substantive content of hospital records because of the presumption of reliability which attaches to statements relating to treatment and medical history in these records. This presumption of reliability . . . arises primarily from the fact that entries in these records are routinely made by those charged with the responsibility of making accurate entries and are relied on in the course of treating patients." Bouchie, supra at 527-528. A trial judge has the discretion to exclude medical records in appropriate circumstances. See Doyle v. Dong, 412 Mass. 682, 687 (1992).

The medical records at issue here were for a patient named "Derrick Williams," who was treated in the emergency room of the hospital on December 25, 2005, for a laceration to his right thigh.  According to these records, the patient stated that he had been wrestling the previous evening when he fell to the floor and onto a knife.  The medical records also specified that "Derrick Williams" was born on November 15, 1979, and his mother's name was "Esther."

At a pretrial hearing, a nurse practitioner employed in the hospital's emergency department testified that she was working the 10 A.M. to 6 P.M. shift on December 25, 2005.  She stated that she treated a dark-skinned male[3] for a laceration on one of his thighs.[4]  State police Lieutenant Keith Blaney testified at trial that when he interviewed the defendant on January 11, 2006, he began by asking some biographical information.  The defendant stated, among other things, that his date of birth was November 15, 1979, that he lived in Rhode Island, and that his mother's name was "Esther."  When Blaney asked the defendant

---

[3] The defendant is African-American.

[4] At the pretrial hearing, the nurse also testified that on March 31, 2006, a State police trooper showed her one photograph of an individual, and she recognized that individual as the patient she had treated on December 25, 2005.  The judge ruled that the identification procedure was unnecessarily suggestive and, therefore, not admissible.  The judge indicated that the nurse could testify at trial regarding what she recalled about treating this individual, but she was not permitted to give any identification testimony.

whether he used any other names, the defendant responded that he had used "Derrick Williams" in the past, although not on Christmas Day. In response to another inquiry from Blaney, the defendant denied that he had a leg injury but, when he lowered his pants, Blaney observed a wound to the defendant's right leg, just above the knee, that was "still puffy and swollen." The defendant denied having gone to the hospital, first telling Blaney that the wound had healed by itself, and then stating that he had glued it. When asked how he had sustained the injury, the defendant gave Blaney several different explanations, including that he had been wrestling.

Following this testimony from Lieutenant Blaney, the judge admitted the medical records, stating that the evidence was sufficient to permit the jury to infer reasonably that the defendant was the person who was treated at the hospital on December 25.[5] We agree. The judge properly determined that an adequate foundational showing for the admission of the medical records had been made.

The defendant next asserts that the judge erred in failing to redact statements in the medical records that indicated how

---

[5] The judge subsequently instructed the jury that they were the ones who had to decide, based on the evidence and the reasonable inferences that could be drawn therefrom, whether the defendant was the patient to whom the medical records pertained. The judge cautioned the jury that they should avoid guesswork, and he also instructed that an individual's use of a different name is not illegal.

the person who was treated at the hospital was injured. In the defendant's view, these statements were statements of liability and did not relate to the patient's treatment and medical history. In addition, he continues, even if the statements did relate to the patient's medical history, they could not be deemed reliable where these particular medical records were not sufficiently linked to the defendant, and, consequently, the individual who made the statements was unknown. We disagree with the defendant's arguments.

The admissibility of medical records relating to "treatment and medical history" is limited by the proviso that "nothing therein contained shall be admissible as evidence which has reference to the question of liability." G. L. c. 233, § 79. We have treated this proviso's reference to "liability" as encompassing criminal culpability. See Commonwealth v. Dargon, 457 Mass. 387, 394 (2010); Commonwealth v. Dube, 413 Mass. 570, 573 (1992). We also have said that "a record which relates directly and mainly to the treatment and medical history of the patient, should be admitted, even though incidentally the facts recorded may have some bearing on the question of liability." Commonwealth v. DiMonte, 427 Mass. 233, 242 (1998), quoting Commonwealth v. Concepcion, 362 Mass. 653, 656 (1972). See Dube, supra.

Here, the statements in the medical records that, the previous evening, the patient had fallen to the floor and onto a knife while wrestling were relevant to his treatment by medical personnel. The amount of time that had elapsed since the patient had sustained the wound, the exact nature of the wound, and the circumstances of its occurrence, which could give rise to concerns about infection, were all important factors that would have a direct bearing on his treatment at the hospital. Given that there was ample evidence for the jury to infer that the medical records were those of the defendant, the statements could be presumed to be reliable. The judge properly determined that there was no need to redact the challenged portion of the medical records. We conclude that the judge did not abuse his discretion in admitting the medical records in evidence.

Following the admission of the medical records, the nurse subsequently testified at trial that at around 10 A.M. on December 25, 2005,[6] she treated a thin, dark-skinned man for a laceration to his thigh, and that this patient had told her that he was injured the previous evening when, as he was wrestling, a knife fell off a counter and hit him in the leg.[7] The nurse also

---

[6] Although the prosecutor asked the nurse about her work on December 26, 2005, the medical records clearly indicate that she treated a patient with a leg laceration on December 25, 2005.

[7] The judge again instructed the jury that they were the ones who had to decide, based on the evidence and the reasonable

identified her signature as the one appearing on the medical records.  The defendant contends that because there was insufficient evidence that he was this patient, the testimony of the nurse constituted hearsay and should not have been admitted. We disagree.  As already discussed, there was sufficient evidence for the jury to reasonably infer that the defendant was the patient who was treated by the nurse.  That being the case, the testimony of the nurse was properly admitted because, as the defendant recognizes, it was not hearsay in these circumstances. See Commonwealth v. Marshall, 434 Mass. 358, 365 (2001) (extrajudicial statements by party opponent not hearsay); Mass. G. Evid. § 801(d)(2)(A) (2015).  We add that the testimony of the nurse was relevant to when the defendant had sustained his injury, how the injury purportedly had occurred, and where on his body the laceration was located.  Accordingly, the judge did not err in admitting the nurse's testimony in evidence.

Finally, the defendant contends that the judge erred in instructing the jury on consciousness of guilt because there was insufficient evidence to support such a charge where, in the defendant's view, the medical records and the testimony of the nurse should not have been admitted.  During the charge conference, the Commonwealth requested a consciousness of guilt

---

inferences that could be drawn therefrom, whether the patient about whom the nurse testified was the defendant.

instruction referencing use of a false name and false statements.  The defendant objected, pointing out that the judge already had given an instruction about the use of a false name, see note 5, supra, and arguing that the jury could draw their own inferences without any further instruction on consciousness of guilt.  The judge disagreed, stating to counsel that if the jury inferred that the patient who was treated at the hospital was the defendant, then they could consider whether the defendant had used a false name for the purpose of concealing his identity.  The judge later instructed the jury on consciousness of guilt in conformity with Commonwealth v. Toney, 385 Mass. 575, 585 (1982).  As part of his instruction, the judge cautioned the jury that there may be numerous reasons why an innocent person might use a false name or make false statements, and that such conduct did not necessarily reflect feelings of guilt.

Because the consciousness of guilt instruction was given over the defendant's objection, we review for prejudicial error. See Flebotte, 417 Mass. at 353.  Such an instruction is appropriate when the jury may draw an inference of guilt "'from evidence of flight, concealment, or similar acts,' such as false statements to the police, destruction or concealment of evidence, or bribing or threatening a witness." Commonwealth v. Stuckich, 450 Mass. 449, 453 (2008), quoting Toney, 385 Mass. at

584.  See Commonwealth v. Jackson, 419 Mass. 716, 730-731 (1995) (misrepresentation of identity may reflect consciousness of guilt).  "The giving of this instruction presupposes that there is evidence of consciousness of guilt, communicates to the jury the judge's belief that there is such evidence, and directs the jury to decide whether to credit this evidence, and, if so, how to factor it into their deliberations."  Commonwealth v. Vick, 454 Mass. 418, 424 (2009).  "It is within the trial judge's discretion whether to instruct the jury regarding the evaluation of evidence pertaining to consciousness of guilt."  Commonwealth v. Morris, 465 Mass. 733, 738 (2013).

We conclude that the judge acted within his discretion in deciding to give an instruction on consciousness of guilt over the defendant's objection.  Such instruction was not based on inadmissible evidence.  To the contrary, it was based on properly admitted evidence -- the medical records and the testimony of the nurse -- from which the jury reasonably could infer that "Derrick Williams," who was treated for a leg laceration at the hospital on December 25, 2005, was, in fact, the defendant.  If the jury found that the Commonwealth had proved that the defendant had used a false name and made false statements, then they properly could consider whether such actions were indicative of consciousness of guilt.

3. Admission of DNA statistical probabilities. Amy Joy, a chemist at the State police crime laboratory, performed DNA analyses on several unknown samples that were recovered from different pieces of evidence. She targeted sixteen regions on the DNA sequence, and then employed a four-step testing process to generate individual profiles. After she had completed her testing, Joy compared each unknown profile to the eleven known profiles of various individuals that had been generated by other chemists at the crime laboratory. Joy testified on direct examination that, when making DNA comparisons, she generated statistics to give more meaning to each item of evidence.

After performing the four-step analysis on a swab of the tip of a black-handled knife, Joy determined that the DNA profile was mixed, meaning it contained the DNA of more than one person, and that the major profile was consistent with that of the defendant. She testified that the probability of a randomly selected, unrelated individual having a DNA profile that matched the major profile on this item was approximately one in 163.8 trillion of the African-American population. Joy also analyzed a swab taken from a reddish-brown stain on a T-shirt found underneath the victim's body at the crime scene. Again, the DNA profile from the swab was mixed. Joy testified that the major profile matched the victim, and the minor profile was consistent with that of the defendant. With respect to this minor profile,

Joy stated that the probability of a randomly selected, unrelated individual having contributed DNA to this mixture was approximately one in 5.3 million of the African-American population.  On cross-examination, Joy testified that once she made her comparisons between the unknown and known DNA profiles, she used a computer program called "Pop Stat" (Pop Stat) to calculate the statistical probabilities.  She further stated that she did not create the computer program.  Rather, it had been supplied to the State police by the Federal Bureau of Investigation.

The defendant contends on appeal that Joy's testimony concerning the probability statistics constituted hearsay, and that the admission of this testimony, over his objections, violated his right to confrontation under the Sixth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.  We review any error in the admission of this evidence under the prejudicial error standard.  See Flebotte, 417 Mass. at 353.

In a criminal trial, we will "not permit the admission of test results showing a DNA match (a positive result) without telling the jury anything about the likelihood of that match occurring."  Commonwealth v. Curnin, 409 Mass. 218, 222 n.7 (1991).  See Commonwealth v. Mattei, 455 Mass. 840, 851 n.25 (2010) (DNA test results inadmissible without accompanying

statistical interpretation); Commonwealth v. Daggett, 416 Mass. 347, 357 (1993) (Abrams, J., concurring) ("expert testimony concerning a DNA match must be accompanied by some background information indicating the probability that the match in question might have occurred by chance"). The rationale for such an approach is that evidence of a DNA match has little or no value without expert testimony explaining the significance of the match, namely, "the mathematical probability that another person has this same DNA profile." Commonwealth v. Tassone, 468 Mass. 391, 402-403 n.2 (2014). See Commonwealth v. Rosier, 425 Mass. 807, 813 (1997); Commonwealth v. Lanigan, 419 Mass. 15, 20 (1994).

As an initial matter, we conclude that Joy's testimony concerning the probability statistics was not hearsay. The function of Pop Stat is to enable DNA analysts to calculate statistical probabilities using population databases. In the absence of computer technology, DNA experts would be performing statistical analyses by hand. "We permit experts to base their testimony on calculations performed by hand, [and] [t]here is no reason to prevent them from performing the same calculations, with far greater rapidity and accuracy, on a computer" (citation omitted). Commercial Union Ins. Co. v. Boston Edison Co., 412 Mass. 545, 549 (1992) (concluding that results of computer program used to calculate building steam usage were admissible).

See Commonwealth v. Whitlock, 74 Mass. App. Ct. 320, 326-327 (2009) (testimony regarding distance between two points that was based on use of computerized map not hearsay).  See also Commonwealth v. Sheldon, 423 Mass. 373, 377 (1996) (blood test results presented through person who conducted test or attending physician admissible).

When Joy testified that she used Pop Stat to calculate statistical probabilities for major and minor DNA profiles, the relevant question was not whether her testimony was hearsay, but whether the foundation was sufficient for the introduction of the observed result.  See Whitlock, supra at 327.  The defendant seems to suggest that because Joy did not create Pop Stat and was not familiar with how the probability statistics were derived, her testimony lacked an adequate scientific foundation. To the extent that the defendant wanted to challenge the scientific reliability of the Pop Stat program, he was required to "file an appropriate pretrial motion stating the grounds for the objections and request a hearing in accordance with the principles set forth in Canavan's Case, 432 Mass. 304, 309-312 (2000), and Commonwealth v. Lanigan, 419 Mass. 15, 24-27 (1994)."  Commonwealth v. Sparks, 433 Mass. 654, 659 (2001). See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592-595 (1993).  See also Commonwealth v. Gaynor, 443 Mass. 245, 263, 268-270 (2005) (judge properly ruled on pretrial motion that

database used by Cellmark Diagnostics Laboratories to make DNA profile frequency calculations was adequate and common within field); Galloway v. State, 122 So. 3d 614, 661 (Miss. 2013), cert. denied, 134 S. Ct. 2661 (2014) (expert witness testified that Pop Stat generally accepted and used by crime laboratories having access to Combined DNA Indexing System database). Because the defendant failed to request a Daubert-Lanigan hearing to establish the reliability of the methodology underlying Joy's testimony, we do not consider the matter further.  See Commonwealth v. Fritz, 472 Mass. 341, 349 (2015) (failure to request Daubert-Lanigan hearing to establish reliability of methodology underlying expert firearms identification testimony constituted waiver of issue).  See also Commonwealth v. Barbosa, 457 Mass. 773, 783 (2010), cert. denied, 131 S. Ct. 2441 (2011) (where defendant fails to file pretrial motion to challenge absence of foundational requirements for expert testimony, such testimony may be admitted in evidence).  Instead, we turn our attention to the defendant's argument that the probability statistics generated by the Pop Stat program violated the defendant's confrontation rights.

The Sixth Amendment, which is applicable to the States through the Fourteenth Amendment, guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . .

to be confronted with the witnesses against him . . . ."  See Pointer v. Texas, 380 U.S. 400, 403 (1965).  The right of confrontation also is protected by art. 12, which provides that in a criminal trial "every subject shall have a right to . . . meet the witnesses against him face to face."  See Commonwealth v. Arrington, 455 Mass. 437, 440 n.4 (2009).  The State Constitution has been interpreted to provide a criminal defendant more protection than the Sixth Amendment in certain respects, see Commonwealth v. Amirault, 424 Mass. 618, 628-632 (1997), but when the issue involves the relationship between the hearsay rule and its exceptions, on the one hand, and the right to confrontation, on the other hand, "the protection provided by art. 12 is coextensive with the guarantees of the Sixth Amendment."  Commonwealth v. DeOliveira, 447 Mass. 56, 57 n.1 (2006).  But see Commonwealth v. Tassone, 468 Mass. at 404 n.3 (questioning whether protections remain coextensive in wake of fractured plurality decision in Williams v. Illinois, 132 S. Ct. 2221 [2012]).

"The confrontation clause bars the admission of testimonial out-of-court statements by a declarant who does not appear at trial unless the declarant is unavailable to testify and the defendant had an earlier opportunity to cross-examine him."  Commonwealth v. Simon, 456 Mass. 280, 296, cert. denied, 562 U.S. 874 (2010).  See Crawford v. Washington, 541 U.S. 36, 53-54

(2004). Whether a particular statement is "testimonial" lies at the core of this analysis. See Davis v. Washington, 547 U.S. 813, 823-824 (2006). In deciding whether an out-of-court statement is testimonial, "[f]irst, we determine whether the statement is testimonial per se," that is, whether it was "made in a formal or solemnized form (such as a deposition, affidavit, confession, or prior testimony) or in response to law enforcement interrogation." Simon, supra at 297, citing Commonwealth v. Gonsalves, 445 Mass. 1, 13 (2005), cert. denied, 548 U.S. 926 (2006). "[I]f a statement is not testimonial per se, we consider whether the statement is nonetheless testimonial in fact." Simon, supra, citing Gonsalves, supra at 12. "A statement is testimonial in fact if 'a reasonable person in the declarant's position would anticipate the statement's being used against the accused in investigating and prosecuting a crime'" (emphasis added). Simon, supra, quoting Gonsalves, supra at 12-13.

We conclude that the probability statistics are not testimonial. With respect to the first part of the inquiry, they are not statements made in a "formal or solemnized form" or "in response to law enforcement interrogation." Simon, 456 Mass. at 297, citing Gonsalves, 445 Mass. at 13. As to the second part of the inquiry, the creator of Pop Stat would not anticipate that the probability statistics would be used to

prosecute this particular defendant. See id. See also United States v. Pritchard, 993 F. Supp. 2d 1203, 1213 (C.D. Cal. 2014) (Pop Stat software used by DNA expert not testimonial, and statistical testimony given in reliance on such software did not violate confrontation clause). Statistical analyses can be performed for many reasons with respect to any number of individuals, wholly unrelated to the defendant in this case. Significantly, as we have discussed, when expert testimony is presented regarding a DNA match, it must include explanatory probability statistics so the jury can understand the significance of the match. See Lanigan, 419 Mass. at 20; Curnin, 409 Mass. at 222 n.7. Concluding that testimony concerning probability statistics violates a defendant's confrontation rights would be inconsistent with our well-established case law on the requirements for the admission of DNA evidence. Moreover, the defendant here was afforded, and took full advantage of, the opportunity to cross-examine Joy on the reliability of the probability statistics about which she testified. The defendant cannot claim a violation of his confrontation rights where he had the opportunity to expose flaws in the basis of Joy's testimony. See Barbosa, 457 Mass. at 785-786. Accordingly, the admission of the probability statistics did not violate the defendant's confrontation rights.

4. <u>Admission of T-shirt</u>. Maureen Hartnett, a chemist at the State police crime laboratory when the murder in this case occurred, testified that she had arrived at the crime scene at around 3 <u>A</u>.<u>M</u>., spent several hours processing the scene, collected a T-shirt from underneath the body of the victim, and brought it back to the laboratory for analysis. When the Commonwealth moved to admit the T-shirt in evidence, defense counsel objected, asserting that he had never received Hartnett's photographs of the T-shirt or a report indicating that she had placed it under a so-called "hood" to dry it out. The judge overruled the defendant's objection and admitted the T-shirt in evidence. However, the judge stated that Hartnett would remain in the court room during the lunch recess so that she could show and explain the photographs and any reports to defense counsel. The judge also stated that defense counsel would have the opportunity to recall Hartnett the following day if he did not feel that he had had sufficient time for cross-examination. Following the lunch recess and his cross-examination of Hartnett, defense counsel stated: "I did have the opportunity to meet with Ms. Hartnett during lunch and she showed me her photographs and I went through her notes. And I was satisfied with the documents that were provided."

The defendant contends on appeal that, due to the Commonwealth's discovery violation, the judge should not have

admitted the T-shirt in evidence. We review any error in the admission of this evidence under the prejudicial error standard. See Flebotte, 417 Mass. at 353.

Pursuant to Mass. R. Crim. P. 14 (a) (1) (A) (vii), as amended, 444 Mass. 1501 (2005), the Commonwealth is obligated to "permit the defense to discover, inspect and copy . . . [m]aterial and relevant police reports, photographs, tangible objects, all intended exhibits, reports of physical examinations of any person or of scientific tests or experiments, and statements of persons the party intends to call as witnesses," provided that such items are relevant to the case and are within the control of the prosecutor. When a party fails to comply with its discovery obligations, Mass. R. Crim. P. 14 (c) (2), as amended, 442 Mass. 1518 (2004), confers on a judge the discretion to exclude evidence based on the party's noncompliance. We are mindful of the fact that discovery sanctions "are remedial in nature" and "should be tailored appropriately to cure the prejudice resulting from a party's noncompliance and to ensure a fair trial." Commonwealth v. Carney, 458 Mass. 418, 427 (2010).

Here, the judge gave defense counsel the opportunity to review Hartnett's photographs and report concerning the T-shirt. Defense counsel indicated that he was satisfied with the judge's approach. We conclude that the judge acted within his

discretion, and that there has been no showing of prejudicial error.

5. Prosecutor's opening statement and closing argument. The defendant maintains that several of the prosecutor's remarks during her opening statement and her closing argument were improper, thus violating his due process rights and denying him a fair trial. The defendant first contends that the prosecutor's references to Christmas in her opening statement were an improper appeal to the jury's emotions.[8] He acknowledges that he did not object to the remarks, but nonetheless argues that they created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Wright, 411 Mass. 678, 682 (1992). We disagree.

While it is improper for the prosecutor to play on the jury's sympathy or emotions, see Commonwealth v. Kozec, 399 Mass. 514, 516-517 & n.5 (1987), "the prosecutor is entitled to set the scene." Commonwealth v. Santiago, 425 Mass. 491, 497 (1997), S.C., 427 Mass. 298 and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998). Given that the murder took place in the

---

[8] At the beginning of her opening statement, the prosecutor made the following remarks: "Christmastime, a time that we gather with our families and friends to plan how we are going to spend our holidays. Christmas time 2005, three men in New Bedford were planning. They were planning a home invasion and an armed robbery." Then, at the end of her opening statement, the prosecutor said, "There was no peace on earth or good will towards men that Christmas day at [the apartment on] Hillman Street."

minutes between Christmas Eve and Christmas Day, the prosecutor's references to Christmas in her opening statement merely set the scene with rhetorical flourish. See Commonwealth v. Mejia, 463 Mass. 243, 255 (2012) (prosecutor's rhetorical flourish not ground for reversal). Although her unnecessary remarks about "peace on earth" and "good will towards men" would have been better left unsaid, their impact was not such that it created a substantial likelihood of a miscarriage of justice. See, e.g., Commonwealth v. Gentile, 437 Mass. 569, 580 (2002). We ascribe "a certain measure of sophistication" to juries, and a bare modicum of sophistication was all that was needed to discount the prosecutor's yuletide comments. Commonwealth v. Wilson, 427 Mass. 336, 350 (1998).

The defendant next argues that the prosecutor's statements in her closing argument regarding the location of DNA evidence were a distortion of the evidence,[9] and that another statement by

---

[9] During her closing argument, the prosecutor first stated, "And you heard that, I would suggest to you, the DNA of Vincent Waddington [sic] was on those stairs and that the DNA of Vincent Waddington [sic] is in the Chevy Lumina. . . . We also have, I would suggest to you, this defendant's DNA found at the scene." Shortly thereafter, the prosecutor stated, "[The dog] didn't contaminate the scene, he didn't cause this defendant's DNA to show up. [The defendant's] DNA is there because he was there." The prosecutor later stated, "I would suggest to you that Mr. Fields tells you that on New Year's Eve he's at, he sees this defendant, 81 Mill Street, I believe, and he's got that same Chevy Lumina, the get-away car, the one that has Vincent Wadlington's DNA in it, even though this defendant says he doesn't know him."

the prosecutor improperly equated a guilty verdict with justice.[10]  Because defense counsel objected to these statements, we review for prejudicial error.  See Flebotte, 417 Mass. at 353.  Remarks made during closing arguments are considered in the context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury.  See Commonwealth v. O'Connell, 432 Mass. 657, 659 (2000), quoting Commonwealth v. Christian, 430 Mass. 552, 564 (2000).

"A prosecutor must limit comment in closing statement to the evidence and fair inferences that can be drawn from the evidence."  Commonwealth v. Kelly, 417 Mass. 266, 270 (1994).  See Commonwealth v. Grimshaw, 412 Mass. 505, 509 (1992) ("A prosecutor may, . . . in closing argument, analyze the evidence and suggest what reasonable inferences the jury should draw from that evidence").  Contrary to the defendant's assertions, the prosecutor's statements concerning the DNA evidence were neither a distortion of Joy's expert testimony nor statements of personal belief.  Rather, they reflected reasonable inferences that could be drawn from Joy's testimony concerning the results of her DNA analyses and the related statistical probabilities.  They also encompassed a proper response to defense counsel's

---

[10] At the end of her closing argument, the prosecutor stated, "And after, ladies and gentlemen, you consider all the evidence, it is the Commonwealth's belief you will come to one true and just verdict and that this defendant is guilty of all charges."

argument that the DNA samples could have been contaminated. See Commonwealth v. Miranda, 458 Mass. 100, 116 (2010), cert. denied, 132 S. Ct. 548 (2011). Similarly, the prosecutor's statement regarding "one true and just verdict" amounted to a fair comment on the strength of the Commonwealth's case and constituted appropriate advocacy. See Kozec, 399 Mass. at 516 (prosecutor allowed to make forceful arguments for conviction based on evidence); Commonwealth v. Johnson, 374 Mass. 453, 459 (1978) (prosecutor expected to argue for decision in favor of Commonwealth). We conclude that there was no error in the prosecutor's closing argument.

6. Motion for required findings of not guilty. At the close of the Commonwealth's case, defense counsel moved for required findings of not guilty as to all of the charges, which the judge denied. Defense counsel informed the judge that he did not intend to introduce any evidence, and he stated that he again would move for required findings of not guilty after he rested his case. The judge responded, "I'll preserve it."

The defendant contends on appeal that the evidence was not sufficient to convict him of any crime, and, therefore, the judge erred in denying his motion for required findings of not guilty. He asserts that because Fields, the only witness who placed the defendant at Busby's apartment, testified pursuant to a cooperation agreement, Fields had every incentive to minimize

his own involvement in criminal activity.  The defendant argues that the only evidence that directly linked him to any crime was questionable DNA evidence.  He points out that Joy's testimony that his DNA was consistent with the major profile found on a knife at the scene was inconsistent with Busby's account of having stabbed one of the intruders in the leg with a sword.  In the defendant's view, his motion should have been allowed.  We disagree.

When reviewing the denial of a motion for a required finding of not guilty, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Commonwealth v. Latimore, 378 Mass. 671, 677 (1979), quoting Jackson v. Virginia, 443 U.S. 307, 318-319 (1979).  The inferences drawn by the jury from the evidence "need only be reasonable and possible and need not be necessary or inescapable."  Commonwealth v. Longo, 402 Mass. 482, 487 (1988), quoting Commonwealth v. Casale, 381 Mass. 167, 173 (1980).  Moreover, evidence of a defendant's guilt may be primarily or entirely circumstantial. See Corson v. Commonwealth, 428 Mass. 193, 197 (1998); Commonwealth v. Donovan, 395 Mass. 20, 25 (1985).  "If, from the evidence, conflicting inferences are possible, it is for the jury to determine where the truth lies, for the weight and

credibility of the evidence is wholly within their province." Commonwealth v. Lao, 443 Mass. 770, 779 (2005), S.C., 450 Mass. 215 (2007).  See Commonwealth v. Merry, 453 Mass. 653, 662 (2009) (existence of contradictory evidence not sufficient basis for granting motion for required finding of not guilty).

Here, the defendant has marshaled the evidence, or the purported lack thereof, in the light most favorable to himself. This is not the proper lens through which to view the evidence. The Commonwealth presented testimony from Fields that the defendant was actively involved in the planning and execution of the armed robbery and home invasion that resulted in the victim's murder and Busby's severe injuries.  The Commonwealth also presented evidence showing that a man using the same alias that the defendant had used in the past, having the same date of birth as the defendant, and having a mother with the same name as the defendant's mother, was treated at the hospital on December 25, 2005, for a leg injury akin to the one that Busby had described inflicting on one of the intruders.  In addition, the Commonwealth presented testimony suggesting that DNA evidence recovered from a knife and from the victim's T-shirt was consistent with that of the defendant.  The evidence and the reasonable inferences that could be drawn therefrom were sufficient to warrant findings that the defendant was guilty of the crimes alleged in the indictments.  The judge properly

denied the defendant's motion for required findings of not guilty and left the assessment of the weight and credibility of the evidence for the jury.

7.  <u>Review pursuant to G. L. c. 278, § 33E</u>.  We have reviewed the entire record and the briefs on appeal and see no reason to order a new trial or reduce the degree of guilt.

<u>Judgments affirmed</u>.