NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12631

COMMONWEALTH  vs.  DANIEL TAVARES.

Bristol.     January 6, 2020. - May 6, 2020.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher, &
Kafker, JJ.

Homicide.  Practice, Criminal, Capital case, Request for jury
     instructions, Motion for a required finding.


Indictments found and returned in the Superior Court
Department on March 28, 2013.

The case was tried before Gary A. Nickerson, J.


Theodore F. Riordan (Deborah Bates Riordan also present)
for the defendant.
Mary E. Lee, Assistant District Attorney, for the
Commonwealth.


LOWY, J.  In December 2015, a jury convicted the defendant,

Daniel Tavares, of murder in the first degree on theories of

deliberate premeditation and extreme atrocity or cruelty, for

the 1988 stabbing death of Gayle Botelho.  The judge sentenced

the defendant to life in prison.[1]  On appeal, the defendant seeks

reversal of his conviction, arguing that the trial judge erred

by denying (1) his requests for a jury instruction pursuant to

Commonwealth v. Croft, 345 Mass. 143, 145 (1962); and (2) his

motions for a required finding of not guilty because the evidence

equally supported two inconsistent propositions, as prohibited

by Croft.  The defendant also requests that we exercise our

power pursuant to G. L. c. 278, § 33E, to reduce his conviction

to manslaughter.  Finding neither reversible error nor reason to

exercise our authority under § 33E, we affirm.

Background.  We recite the evidence in the light most

favorable to the Commonwealth, reserving certain details for

later discussion.  See Commonwealth v. Rodriguez, 456 Mass. 578,

579 (2010).  The victim went missing on or about October 27,

1988.  At the time of her disappearance, the victim lived on

Prospect Street in Fall River with her boyfriend, Carlos

DaPonte, and his brother, Gil DaPonte.[2]  The defendant lived

across the street with his mother, and as relevant here, his

mother's friend, Richard Pires.  Neither the defendant nor

---

[1] The judge ordered that the defendant serve his sentence
from and after the sentence imposed by the State of Washington
in or around 2007, as discussed infra.

[2] Because they share a last name, we refer to Carlos and Gil
individually by their first names and collectively as the
DaPontes.

anybody else was arrested in connection with the victim's disappearance, until the defendant was charged in 2012.

1. The defendant's first version of events. In 1991, the defendant killed his mother and pleaded guilty to manslaughter. He was sentenced to from seventeen to twenty years in State prison. In September 2000, while incarcerated, the defendant wrote to a Bristol County assistant district attorney, claiming to know the location of a murder victim's body, which he would disclose, along with other relevant information, in exchange for a reduced sentence.[3] During a series of interviews that took place over the subsequent months, the defendant told Detective John McDonald the following details about the night the victim was murdered: the victim, Carlos, Gil, and their friend, Raymond Paiva, were all at the defendant's house with the defendant. The defendant gave Carlos some cocaine to sell and Carlos left. The defendant then stepped outside to speak to his girlfriend, Michelle Cardoza, for about ten to fifteen minutes. When the defendant returned to his bedroom, he saw Gil holding a knife and the victim on the floor with stab wounds to her back. The defendant further stated that he was not present during the stabbing.

---

[3] The defendant was not paroled, nor was his sentence reduced in exchange for any information given to police. The defendant also told police that he had contacted them because he had found God and wanted to clear his conscience.

When the defendant asked what had happened, Gil confessed to stabbing the victim, and the defendant announced he was going to call for help. Gil then pulled out a handgun, put it to the defendant's head, and fired a round, which grazed the defendant's forehead. The defendant then said he had to leave to pick up Cardoza, and he instructed Gil and Paiva to remove the victim's body. When the defendant returned approximately twenty minutes later, he saw Gil and Paiva carrying the victim's body, wrapped in a blanket, down the stairs and into the back yard.[4] Later, Gil and Paiva pointed to an area of the back yard and told the defendant that that was where they had buried the victim's body. The defendant had been clearing that area for a tomato garden, and he suspected that that was where Gil and Paiva buried the body.[5]

2. The initial investigation. After two interviews with the defendant, in October 2000, the police went to the defendant's former house on June Street. In the defendant's bedroom, they found a bloodstained section of floor. In the back yard, the police recovered a human skeleton and positively

---

[4] The defendant also told police that because Cardoza saw Gil and Paiva carrying the victim, the defendant explained to her that the victim had been hurt.

[5] After this meeting with the defendant, Detective McDonald met with Cardoza, who confirmed the defendant's version of events.

identified the remains as those of the victim. The autopsy concluded that the cause of death was homicidal violence including stabbing to the victim's back.

Shortly thereafter, Lori Moniz, the defendant's former girlfriend, saw a news report that a body had been discovered in the defendant's back yard. She contacted the police. At a subsequent meeting, she reported that, on an evening in late October 1988, the defendant had telephoned and told her to come to his house because he wanted to show her something. When Moniz arrived, the defendant answered the door, appearing nervous and excited. Moniz followed the defendant upstairs to his bedroom and, as she approached, she saw the defendant on his hands and knees scrubbing what appeared to be a large pool of blood from the rug. Upon seeing this, Moniz rushed down the stairs to leave. The defendant ran after her, explaining that the blood was fake and a joke for Halloween.

3. The defendant's second version of events. In 2002, the defendant changed his story: The defendant stated that he witnessed Gil stab and murder the victim and that Cardoza was not there that night. In 2002, Cardoza also told Detective McDonald that, at the defendant's request, she had lied about being with the defendant on the night of the murder. The Commonwealth did not charge the defendant with the victim's murder at this point.

4. _Further investigation_. In 2007, the defendant completed his sentence for his mother's homicide, and within days of his release from prison, he moved to the State of Washington. Shortly thereafter, the defendant killed two people. While incarcerated in Washington, the defendant learned of a book that discussed the victim's murder, including the defendant's cooperation with the police. In 2012, another individual incarcerated in the same Washington prison as the defendant told the Fall River police department that he had discovered an open letter, written on the cover of a book in the prison library, in which the author, later confirmed to be the defendant, refuted the notion that the defendant had cooperated with police and, instead, asserted that he was the only suspect in the victim's murder case, not a "rat."

5. _The defendant's 2012 confession_. In November 2012, Detective McDonald traveled to Washington to meet with the defendant, at which point, the defendant changed his story again. The defendant stated that he alone murdered the victim (2012 confession). In this version, the defendant was angry with the victim, the DaPontes, and Paiva for stealing cocaine from him, and he planned to kill all of them in retaliation for the theft. On the day of the murder, he walked across the street to the victim's house, and the victim answered the door. The defendant asked if Carlos was home, but he was not. The

defendant told the victim that he knew all four of them had stolen from him and that he wanted them to start selling cocaine for him to repay their debt. The defendant then invited the victim across the street to retrieve some cocaine from his house. Upon entering his bedroom, the defendant laid out a line of cocaine for the victim. While the victim bent over to ingest the line, the defendant took a handgun and tried to shoot her, but the slide on the gun jammed. The defendant then reached for a knife that was on his bureau and stabbed the victim seven or eight times. The victim fell, and her blood soaked the floor. The defendant then moved the victim's body to the back yard, removed the victim's clothes, and buried the victim's body, face down, in the back yard. The defendant told Detective McDonald that he would not have confessed if not for the book that had been written, because he refused to be known as a "rat."[6]

In February 2013, the defendant confessed three more times in writing to (1) his former roommate, Richard Pires;

---

[6] The defendant also said that he accused Gil and Paiva of the murder because they benefited from the stolen cocaine, so by pinning it on them, he could kill two birds with one stone.

(2) Detective McDonald;[7] and (3) his former false alibi witness,[8] Cardoza.

A grand jury indicted the defendant for the victim's murder in 2013, and the jury trial began on November 16, 2015. At trial, the defendant argued that he gave a false confession to avoid being labeled a "rat" in prison. He called an expert witness who testified to the dangers of being considered a "rat" within the prison system. The jury convicted the defendant.

Discussion. 1. Jury instruction. On appeal, the defendant argues the judge erred in denying the defendant's requests for a jury instruction pursuant to Croft, 345 Mass. at 145.[9] Because the defendant preserved this issue at trial, we

---

[7] The defendant had kept in contact with Pires while incarcerated in Massachusetts and in Washington. Pires testified that the defendant wrote to him on a somewhat regular basis.

The defendant told Pires that he had to "take them out" because "Carlos and his girl stole something from [him] that was not [his]" and that he "did [the crime] alone." The defendant also said that he confessed to Lori Moniz and a woman who lived across the street. In the letter to Detective McDonald, the defendant wrote, "I acted alone and that's that." The defendant reiterated to both of them that he came clean because the book that had been written about the murder made him look like a "rat."

[8] Also in February 2013, the defendant wrote Cardoza, admitting that he had asked her to lie for him and told her not to lie for him anymore.

[9] The defendant's requested jury instruction was modified from the language in Croft. The requested instruction stated, "Where the evidence tends equally to sustain either of two

review for prejudicial error.  See Commonwealth v. Cruz, 445
Mass. 589, 591 (2005).

We have long upheld the principle articulated in Croft that
"[w]hen the evidence tends equally to sustain either of two
inconsistent propositions, neither of them can be said to have
been established by legitimate proof."  Croft, 345 Mass. at 145,
quoting Commonwealth v. O'Brien, 305 Mass. 393, 400 (1940).  See
Commonwealth v. Kelly, 470 Mass. 682, 693-694 (2015).  Our
decision in Croft does not provide for a jury instruction, and
we have never interpreted it as such.[10]  Indeed, we previously
held that "a reference to the consequences of an even balance in
the evidence preferably should not be included in a charge on
reasonable doubt," Commonwealth v. Hunt, 462 Mass. 807, 825-826
(2012), quoting Commonwealth v. Beverly, 389 Mass. 866, 872-873
(1983), because such an instruction may lead the jury to
improperly infer that if the balance is weighted even slightly

---

inconsistent propositions, neither of them can be said to have
established guilt beyond a reasonable doubt.  In such a case,
the evidence is insufficient to sustain the burden of proof
imposed upon the Commonwealth."  See Croft, 345 Mass. at 145.

[10] Even the cases to which the defendant cites in his brief
do not mention Croft in the context of a jury instruction.
Rather, they discuss the circumstances in which the trial judge
should have granted the defendant's motion for a required
finding of not guilty.  See Commonwealth v. Rivera, 460 Mass.
139, 144 (2011) (judge erred in denying defendant's motion for
required finding of not guilty); Croft, 345 Mass. at 145 (same).
See Rodriguez, 456 Mass. at 582-583 (insufficient evidence to
support convictions).

in favor of the defendant's guilt, the jury would be required to find the defendant guilty, see Commonwealth v. Saladin, 73 Mass. App. Ct. 416, 419 (2008).

Instead, the principle articulated in Croft provides a standard for judges to apply when considering a motion for a required finding of not guilty and for appellate courts to apply when reviewing the sufficiency of the evidence.  There was no error.

3.  Required finding of not guilty under Croft.  The defendant also argues that the judge erred in denying his motions for a required finding of not guilty both at the close of the Commonwealth's case and at the close of all of the evidence.  We review to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Commonwealth v. Cole, 473 Mass. 317, 334 (2015), overruled on another ground, Commonwealth v. Wardsworth, 482 Mass. 454 (2019), quoting Commonwealth v. Latimore, 378 Mass. 671, 677 (1979).

Citing Croft, the defendant argues that because the Commonwealth based its entire case on the defendant's 2012 confession, the whole of the evidence supports two inconsistent propositions:  (1) the 2012 confession was truthful and he murdered the victim or (2) the 2012 confession was untruthful

and was an effort to avoid being labeled a "rat" while serving sentences in prison.  The defendant further argues that because the evidence equally supports both propositions, the judge erred in denying the defendant's motions for a required finding of not guilty.  See Croft, 345 Mass. at 145.  The defendant is correct that Croft requires a judge to grant a defendant's motion for a required finding of not guilty when "the evidence tends equally to sustain either of two inconsistent propositions" (citation omitted).  Id.  That is not this case.

This principle applies only in circumstances in which, even viewing the evidence in the light most favorable to the Commonwealth, "choosing among the possible inferences from the evidence presented," would require a jury "to employ conjecture."  Id. at 145 (evidence equally supported inference that defendant possessed heroin with intent to sell it and inference that defendant possessed heroin until he was certain he had defeated his habit).  See Rodriguez, 456 Mass. at 582-583 (evidence equally supported inconsistent inferences that buyer either obtained cocaine from third person or from defendant); Commonwealth v. Eramo, 377 Mass. 912, 913 (1979) (evidence equally supported inconsistent inferences that defendant either issued prescription due to his independent medical judgment or pursuant to request without legitimate medical purpose).  However, "it is for the jury to determine where the truth lies,

for the weight and credibility of the evidence is wholly within their province." Cole, 473 Mass. at 334, quoting Commonwealth v. Lao, 443 Mass. 770, 779 (2005), S.C., 450 Mass. 215 (2007) and 460 Mass. 12 (2011). See Commonwealth v. Merry, 453 Mass. 653, 662 (2009) (jury not required to believe testimony of defendant's expert); Commonwealth v. Clifford, 374 Mass. 293, 297 (1978) (jury not required to disbelieve witnesses' testimony placing defendant at scene of crime).

The likelihood of the defendant's 2012 confession being truthful or being untruthful are not in equipoise. The weight of the Commonwealth's evidence in this case, moreover, was overwhelming and, contrary to the defendant's arguments, included much more than just the defendant's 2012 confession to Detective McDonald. See Commonwealth v. Weaver, 474 Mass. 787, 791 (2016), aff'd 137 S. Ct. 1899 (2017), citing Commonwealth v. Forde, 392 Mass. 453, 458 (1984). The victim's body was buried in the defendant's back yard. The police found dried blood in the defendant's bedroom. It was reasonable for the jury to conclude that, just hours after the murder, the defendant's former girlfriend saw the defendant cleaning up a pool of blood in the very same bedroom. One of the defendant's then roommates observed blood on the defendant's shirt in the washing machine, a pool of blood on the basement floor, and a pitchfork and shovel also in the basement near the door leading to the back

yard.  The roommate had never seen the pitchfork and shovel in that location before.  In addition to the 2012 confession to police, the defendant separately confessed to Pires and to Cardoza,[11] and the Commonwealth put forth ample evidence corroborating the defendant's confessions.[12]  The jury were free, but not required, to believe that the defendant truthfully confessed to murdering the victim.[13]  See Merry, 453 Mass. at 662.  Moreover, even without the defendant's explicit confession to the murder, the defendant does not contest the statements he made to police in 2000 and 2002.  He also admitted, without recantation, that he knew the victim; that he was angry with her for stealing cocaine from him; that the victim was murdered in his bedroom; and that he knew where the victim's body was

---

[11] The defendant also confessed to Detective McDonald a second time in writing.

[12] The defendant confessed to Pires that the defendant cut out a section of his rug, and Pires testified that he had observed the same.  The defendant confessed that he stabbed the victim seven or eight times, removed the victim's clothes, and buried the victim's body face down, three facts that were never publicly disclosed.

[13] The defendant's recitation of facts that contradict his confessions are of no moment, as we view the evidence in the light most favorable to the Commonwealth when reviewing the sufficiency of the evidence.  See Cole, 473 Mass. at 334 ("Here, the defendant has marshaled the evidence, or the purported lack thereof, in the light most favorable to himself.  This is not the proper lens through which to view the evidence"); Merry, 453 Mass. at 662 ("That contradictory evidence exists is not a sufficient basis for granting a motion for a required finding of not guilty").

buried.  We conclude that, viewing the evidence in the light most favorable to the Commonwealth, a rational jury could have found that the defendant was guilty of murder in the first degree on both the theories of premeditation and extreme atrocity or cruelty.

4.  Review under G. L. c. 278, § 33E.  We have reviewed the entire record pursuant to our responsibilities under G. L. c. 278, § 33E.  We conclude that there is no basis for reducing the defendant's sentence or ordering a new trial.  The defendant's conviction is affirmed.

So ordered.