NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12383

COMMONWEALTH vs. SIFA LEE.[1]


Essex.     May 10, 2019. - November 12, 2019.

Present: Gants, C.J., Gaziano, Budd, & Cypher, JJ.


Homicide. Stealing by Confining or Putting in Fear. Armed
     Assault with Intent to
     Murder. Interpreter. Constitutional Law, Fair trial,
     Assistance of counsel, Self-incrimination, Waiver of
     constitutional rights. Due Process of Law,
     Interpreter. Fair Trial. Jury and Jurors. Witness, Self-
     incrimination. Practice, Criminal, Capital case,
     Interpreter, Fair trial, Assistance of counsel,
     Instructions to jury, Empanelment of jury, Waiver.




     Indictments found and returned in the Superior Court
Department on December 28, 2011.

     The cases were tried before David A. Lowy, J., and a motion
for a new trial, filed on September 19, 2017, was considered
by Timothy Q. Feeley, J.


     Russell C. Sobelman for the defendant.
     Kenneth E. Steinfield, Assistant District Attorney, for the
Commonwealth.


---

     [1] As is our custom, we spell the defendant's name as it
appears on the indictments.

GAZIANO, J.  In the early morning hours of September 27, 2011, three robbers broke into a restaurant by climbing through a rooftop ventilation shaft.  Once inside, the robbers encountered the sixty-two year old victim, restaurant owner Shui Woo, who had slept in his office that night.  One robber, later identified as the defendant, struck the victim, bound his feet and hands, and ordered him to open a safe.  When the victim failed to do so, the robbers beat him to death with a crowbar and a hammer.

A Superior Court jury convicted the defendant of murder in the first degree on theories of extreme atrocity or cruelty and felony-murder, stealing by confining or putting in fear, and armed assault with intent to murder a person age sixty or older. In this direct appeal, the defendant contends that he was deprived of his constitutional rights to a competent interpreter to interpret the trial proceeding into his native language.  He argues also that he is entitled to a new trial because trial counsel provided ineffective assistance; several jury instructions were erroneous; and the trial judge abused his discretion in making certain rulings concerning the conduct of the trial.  In addition, the defendant asks this court to use our extraordinary power under G. L. c. 278, § 33E, to reduce the verdict or to order a new trial.  For the reasons that follow,

we affirm the convictions and decline to exercise our authority under G. L. c. 278, § 33E.

1. Prior proceedings. In December 2011, a grand jury returned indictments charging the defendant, Cheng Sun (Sun), and Jun Di Lin (Lin) with murder, G. L. c. 265, § 1; stealing by confining or putting in fear (stealing), G. L. c. 265, § 21; and armed assault with intent to rob a person age sixty or older (armed assault), G. L. c. 265, § 18 (a). In September 2014, Lin pleaded guilty to manslaughter, stealing, and armed assault in exchange for an agreement to testify against his codefendants. In January 2016, a joint trial commenced against the defendant and Sun. The judge was required to continue the case after seven days of empanelment because it was difficult to locate the necessary multiple Chinese-language interpreters for the defendant and Sun. Thereafter, the two cases were severed; Sun was convicted on all charges at his trial in January and February 2016.

In May 2016, following a twenty-nine day trial, a jury convicted the defendant on all charges. The defendant filed a timely notice of appeal. In September 2017, before his direct appeal had been briefed, he moved for a new trial on multiple grounds. A Superior Court judge, who was not the trial judge, denied the defendant's motion without a hearing. We

consolidated the defendant's direct appeal from his convictions and his appeal from the denial of the motion for a new trial.

2. Background. We summarize the facts the jury could have found, reserving additional facts for our discussion of the issues. The victim owned and operated a restaurant located on Route 1 in Ipswich. He had been born in China in 1949, had immigrated to the United States as a teenager, and had purchased the restaurant in 1987. The victim lived in Quincy with his family, but spent the majority of his time at the restaurant, which was open 364 days a year. He slept at the restaurant four to five nights a week, on a make-shift bed in his office, because he wanted to "know everything that was going on," as well as to accommodate early morning deliveries. When he stayed at the restaurant overnight, the victim locked the doors from the inside prior to going to sleep.

The office, which was next to the kitchen, contained a large, metal safe. Inside the kitchen, a portion of the suspended ceiling had been removed to expose a crude ventilation shaft cut into the roof. At the end of the work day, or when it rained, restaurant workers went onto the roof through an access door and covered the ventilation shaft with an unsecured wooden cover.

The victim employed a few long-term employees, including a head chef, a hostess, and a waitress. The majority of the

workers, however, were temporary; they were drawn from Boston's Chinatown neighborhood and transported to Ipswich by a company van.  The victim had employed hundreds of temporary workers over the course of the twenty years that he operated the restaurant.  The defendant was one such employee; he had washed dishes at the restaurant for two days either in 2010 or 2011.

On Monday, September 26, 2011, the victim's son, a restaurant manager, worked with his father until sometime between 11:30 P.M. and midnight.  At 12:30 A.M., on his way home, the son drove a group of employees back to Chinatown.  The victim stayed behind, locked the doors, and went to sleep.  The next morning, an employee found the victim's bloody body in the office.  The victim's ankles were bound with a black power cord and his wrists were bound with a computer cord and a belt.  A medical examiner later determined that the victim had suffered extensive injuries including two skull fractures, a fractured arm, twelve rib fractures, and stab wounds to the back and extremities.  He died as a result of multiple blunt and sharp force injuries and asphyxia due to strangulation.

The handle and keypad to the office safe were stained with the victim's blood.  The police recovered a bloody knife on the office floor near the victim's body and the safe.  In the kitchen, police found tin snips (a tool capable of cutting wire) and a baseball hat on a table underneath the ventilation shaft.

The wooden cover to the ventilation shaft had been removed. Investigators found approximately $2,800 in cash under the cushions of the victim's make-shift bed, and $50,000 in cash in the safe.

The investigating officers were able to establish a likely timeline for the robbery. At 3:15 A.M., the robbers cut the restaurant's telephone lines and electrical power wires at the utility panel located in the back parking lot. At 3:30 A.M., a truck driver pulled into the parking lot belonging to the pipe supply company next door to the restaurant to begin a morning delivery. The driver noticed a white taxicab parked on the side of the warehouse that abuts the restaurant. The taxicab had "Boston Cab Assoc" written in red letters on the passenger's side door; it was unoccupied.

Officers did not identify a suspect in the first few days of the investigation. That changed on September 29, when Lin contacted the police, identified himself as the operator of the white taxicab, and provided information about his two accomplices in the robbery. Lin consented to the search of his taxicab, a hand-held global positioning system (GPS) device, and his home. Police also obtained records from a "CMT" device installed in Lin's taxicab, which captured and transmitted, at least once every three minutes, "extremely accurate" information

about the location of the taxicab, its speed and direction, and meter activity.

At trial, Lin provided the following account.[2] Approximately two weeks before the robbery, Lin met the defendant and Sun at a casino in Connecticut. They spent a few days gambling together, and exchanged telephone numbers. The defendant asked Lin if he knew any "wealthy people." They also discussed "well-known" restaurant owners. Thereafter, Lin drove the defendant and Sun to Boston-area restaurants in his taxicab, presumably searching for likely places to rob.

On September 27, 2011, at approximately 2 A.M., while Lin was at his home in Malden, he received telephone calls from the defendant and Sun. Lin agreed to meet them in Boston. Either the defendant or Sun brought a black bag, which was placed in the trunk of the taxicab. The defendant directed Lin to the restaurant in Ipswich. They arrived at 3 A.M. Lin parked the taxicab next door to the restaurant, near the side of the pipe supply building. The defendant and Sun retrieved items from the black bag; they told Lin to wait for them, and walked toward the rear of the restaurant.

---

[2] In exchange for Lin's cooperation, the Commonwealth agreed to reduce the murder indictment to the lesser included offense of manslaughter, and to a combined sentence of from fifteen to twenty-five years for manslaughter and stealing, and five years of probation for the armed assault.

When they returned, the defendant was carrying a crowbar, and both wore gloves and masks.  Either the defendant or Sun asked Lin to help them steal a safe containing "a lot of money."  Wearing a baseball hat supplied by the defendant, and gloves, Lin followed the defendant and Sun to the rear of the restaurant.[3]  The three climbed up the roof by stepping onto an ice machine condenser, and dropped into the kitchen through the ventilation shaft.

While walking alone through the dining room, Lin heard the victim screaming "very loudly" in the office.  Lin entered the office and saw Sun holding a knife to the injured victim's throat.  The defendant beat the victim with the crowbar on the abdomen and legs.  The victim was pleading, "What do you want?"; "Don't hurt me"; "Whatever you want I will give you everything."  The victim promised to open the safe.  At Sun's suggestion, Lin and the defendant bound the victim's ankles and hands.  Lin helped drag the victim, who was unable to walk, to the safe.  The victim was propped up facing the safe; he twice attempted to enter a code on the keypad.  Upset that the victim was "playing games," the defendant beat him with the crowbar.  Lin took the

---

[3] A scraping from the interior headband of the baseball hat found inside the restaurant contained a mixture of deoxyribonucleic acid (DNA) from at least two individuals.  The defendant's DNA matched the major profile, and Lin matched the minor profile.

crowbar away, but the defendant then beat the victim with a hammer retrieved from the black bag.

The three departed the restaurant through the ventilation shaft, leaving the victim unconscious on the office floor. Upon returning to the taxicab, the defendant expressed frustration that "after all that work" they had been unable to steal the large sum of money he believed had been in the safe. Sun's hand was injured, and their clothing had been stained with the victim's blood.

Lin drove the defendant and Sun to casinos in Connecticut. The three men obtained clean clothing, some from one of the defendant's friends, and some that was purchased in the casino shops. After changing, they washed the bloodstained clothes at a laundromat, and disposed of other evidence in a nearby Dumpster.[4]

The defendant testified in his own defense. He admitted that he, Lin, and Sun drove to the restaurant on September 27, 2011. He maintained, however, that Lin and Sun had planned the robbery. He had been unaware of the plan, because Lin and Sun

---

[4] The Commonwealth offered evidence that, it contended, corroborated Lin's testimony. The evidence included surveillance video footage taken from businesses located on Route 1 near the restaurant, two Connecticut casinos, and the businesses near the laundromat. The Commonwealth also introduced evidence from Lin's GPS device and the taxicab's CMT system that showed its path of travel on September 27, 2011.

spoke to each other in the Fuzhou dialect, which the defendant does not understand. The defendant also testified that Lin and Sun entered the restaurant while he remained outside, "foolishly" playing video games on his cellular telephone "to calm [himself] down." The defendant maintained that he had not touched the victim.

3. Discussion. After he filed his direct appeal, but before briefs had been submitted, the defendant filed a motion for a new trial in this court. We stayed the appeal and remanded the motion to the Superior Court.

In his motion for a new trial, the defendant raised eight issues. He argued that (1) the judge did not appoint a competent interpreter; (2) trial counsel was ineffective; (3) certain of the jury instructions were erroneous; (4) the judge erred in denying the defendant's motions for a mistrial; (5) the judge did not use the Walker method of jury empanelment, see Commonwealth v. Walker, 379 Mass. 297, 299 n.1 (1979); (6) the judge's vacation unnecessarily delayed the trial; (7) the "jury was infected with prejudicial bias based on certain rulings by the judge"; and (8) the defendant should not have been sentenced on the second and third indictments. The motion judge, who was not the trial judge, denied the motion without a hearing because he found that "the [ineffective assistance] claim is not a substantial issue raised by the

motion or affidavit, and is not supported by a substantial evidentiary showing." Citing the availability of appellate review, the judge declined to rule on the other asserted grounds for a new trial.

On appeal, the defendant pursues the first six of the issues that he raised in his motion for a new trial. Focusing in particular on his constitutional arguments with respect to the interpreters, the defendant contends that "the original criminal proceeding was infected with prejudicial constitutional error" due to inadequacies with the interpreters provided. In addition to raising all the arguments from his motion for a new trial except for his claims of prejudicial bias and sentencing on the second and third indictments, the defendant also raises one new claim on appeal. He argues that a new trial is required because the judge did not sua sponte conduct a colloquy of the defendant before he testified, to ensure that the decision to waive his right to silence was voluntarily made. The defendant also asks this court to exercise its authority pursuant to G. L. c. 278, § 33E, to order a new trial or to direct the entry of a lesser degree of guilt.

a. Whether the defendant was deprived of his right to a competent interpreter. i. Background. The judge confronted numerous issues surrounding the interpreters throughout the two-month trial. At the conclusion of the trial, the judge made

detailed findings of fact to explain his rulings. We briefly summarize these findings, supplemented with uncontroverted evidence from the record.

The defendant, who was born in China, does not speak English. At his January 2012 arraignment in the Superior Court, he filed a motion requesting funds for an interpreter because "his native language is Cantonese[]." In subsequent pretrial motions, the defendant continued to represent that "his native language is Cantonese[]" and "his native language is the Cantonese dialect of Chinese." As a result, the judge appointed Cantonese interpreters to interpret for the defendant in twenty-three court appearances. These pretrial matters included a complex motion to suppress raising issues of cell site location information.

On January 13, 2016, the judge began to empanel a jury in the joint trial of the defendant and Sun. During seven days of jury selection, the judge provided the defendant with Cantonese interpreters, and Sun with Mandarin interpreters. On January 20, 2016, the defendant objected to the qualifications of one of the Cantonese interpreters. He did not, however, indicate that he was unable to understand this interpreter's Cantonese.

The defendant's severed trial commenced on March 8, 2016, with two Cantonese interpreters, Lewanna Li (Li) and Melissa Lo (Lo). On the fourth day of empanelment, the defendant asserted

that "some of the interpretation" by Li was inaccurate.  Defense counsel informed the judge that the defendant "does speak Cantonese, but that is not his native Chinese language.  His native Chinese language is [Taishanese].  The language spoken in the Province of [Taishan], China. . . .  [A] [Taishanese] interpreter would be more suitable for [the defendant]."[5]  The judge continued to empanel with Lo as the sole interpreter, and scheduled a hearing for the following day.

The next day, counsel stated that he had spoken to the defendant regarding "the [e]mpanelment process, his understanding of the process and the potential for errors in translation."  After these discussions, trial counsel explained, the defendant had "clearly and unequivocally conveyed to [trial counsel] that he understood the [e]mpanelment process."  Counsel added that the defendant was "raising no issues with regard to that whatsoever."

The judge conducted a colloquy with the defendant to confirm that he had knowingly and voluntarily withdrawn his objection to the interpretation of the proceedings.  The

---

[5] The defendant's language is spoken in the southern portion of the Guangdong province in China.  See C. Szedo, Testing Intelligibility Among Sinitic Dialects, Proceedings of the 2000 Conference of the Australian Linguistic Society 1 (Szedo).  It has a number of spellings in written English.  Trial counsel referred to the defendant's language as "Taosenese."  For consistency, we use the spelling "Taishanese" throughout.

defendant said that he was born in China, and speaks Cantonese and Taishanese.  When asked about the conduct of the interrupted trial, the defendant stated that he had had "a little bit" of "difficulty" with the interpretation because some of the words spoken during jury voir dire were not, in his opinion, interpreted.  With respect to this trial, the defendant indicated that he understood that he had a right to "be present during a trial, to understand what is happening and to be able to assist meaningfully with . . . [his] defense."  After the colloquy, the judge found that "the defendant [had] been able to understand what [was] going on . . . and that the defendant [had] knowingly, willingly and voluntarily answered the [c]ourt's questions and the [c]ourt [was] comfortable to make a finding that the defendant [was] able to fully participate in the proceedings."

On April 5, 2016, the judge found Cantonese interpreter Stephanie Liu (Liu) to be qualified to interpret pursuant to G. L. c. 221, § 92, and Mass. R. Crim. P. 41, 378 Mass. 918 (1979).  The defendant informed the judge that "he [was] much more comfortable with [Taishanese] than he [was] in Cantonese," and would "prefer a [Taishanese] interpreter."  Thereafter, the defendant expressed his dissatisfaction with Liu.  The defendant contended that "he did not understand, because of poor interpretation, much of what was said during the opening

statements of counsel and during the testimony of the witness [on the first day of trial]."  The judge observed that he did not credit the defendant "for so many reasons," but would make specific findings of fact at a later point.  The defendant asserted that he required a Taishanese interpreter "to vindicate his constitutional rights."

On April 12, 2011, the defendant renewed his request for a Taishanese interpreter because he had "only understood [ninety] percent of what was translated to him on the day before."  The judge conducted a voir dire hearing to address the defendant's contention that he did not understand the Cantonese interpreters.  The defendant waived the interpreter privilege, see Mass. G. Evid. § 522(b) (2019), and Liu and Lo testified that they were both able to speak to the defendant in Cantonese and understood his Cantonese responses.  Lo added that she also spoke Taishanese, which she had learned at a young age from her greatgrandmother.  She had not, however, interpreted words into Taishanese until the day of the voir dire hearing.

The judge found "that the defendant speaks Cantonese fluently" and that the defendant's claim he did not understand the proceedings was not credible "to an exponential degree." The judge nonetheless agreed to appoint the defendant a Taishanese interpreter.  The next day, the judge conducted a hearing and appointed Taishanese interpreter Way Moy (Moy), who

recently had retired as a staff interpreter for the New York Supreme Court. The defendant objected to Moy's lack of certification in Massachusetts. The following day, April 14, 2016, the defendant expressed dissatisfaction with Moy's interpretation. He said that "he speaks a variation of [Taishanese]" that [Moy] does not speak." The defendant characterized Moy's Taishanese as "broken" or "very old school[]," dating to the 1920s and 1930s. The judge found that Moy was highly qualified in Taishanese and that the defendant had received "the interpreter that he wanted."

ii. Analysis. A failure to provide a non-English speaker with a competent interpreter implicates multiple constitutional rights. As a matter of fundamental fairness, a defendant has a due process right to understand the proceedings. See United States v. Lopez-Collazo, 824 F.3d 453, 460-461 (4th Cir. 2016), cert. denied, 137 S. Ct. 628 (2017). See also United States ex rel. Negron v. New York, 434 F.2d 386, 388 (2d Cir. 1970) (for non-English speaker deprived of adequate interpreter, most of trial is "[a] babble of voices"). A judge also is required to provide a non-English speaker with a competent interpreter in order to safeguard the defendant's rights under the Sixth Amendment to the United States Constitution, and art. 12 of the Massachusetts Declaration of Rights, to be present at trial and to confront adverse witnesses. Commonwealth v. Garcia, 379

Mass. 422, 437 (1980).  See United States v. Carrion, 488 F.2d 12, 14 (1st Cir. 1973), cert. denied, 416 U.S. 907 (1974) ("right to confront witnesses would be meaningless if the accused could not understand their testimony, and the effectiveness of cross-examination would be severely hampered").  A non-English speaker also is entitled to competent interpretation in order to consult meaningfully with counsel during the trial.  United States ex rel. Negron, supra at 389.

In addition, a non-English speaker has a statutory right to a court-appointed qualified interpreter.  See G. L. c. 221C, §§ 1-2; G. L. c. 221, § 92.  General Laws c. 221C, § 2, provides that "[a] non-English speaker, throughout a legal proceeding, shall have a right to the assistance of a qualified interpreter."  A "qualified interpreter" is defined as "a certified interpreter who has also passed the examination [given by the office of court interpreter services] and been qualified for interpreting in the [F]ederal courts by the United States [D]istrict [C]ourt of the [D]istrict of Massachusetts."  G. L. c. 221C, § 1.  In the event that a "qualified interpreter" is not "reasonably available," a judge shall appoint a "certified interpreter."  G. L. c. 221C, § 2.  Under G. L. c. 221C, § 1, a "certified interpreter" is "an interpreter who has been duly trained and certified" by the office of court interpreter services.

Pursuant to G. L. c. 221, § 92, a Superior Court judge "may appoint such official interpreters as they may deem necessary for the sessions of the court."  The judge also has authority to appoint "other interpreters when the services of the official interpreters are not available."  G. L. c. 221, § 92.  See Mass. R. Crim. P. 41 ("The judge may appoint an interpreter or expert if justice so requires and may determine the reasonable compensation for such services and direct payment therefor").  Implicit in the judge's authority to appoint an interpreter pursuant to G. L. c. 221, § 92, and Mass. R. Crim. P. 41, is the understanding that the individual appointed to interpret is competent.  See United States v. Villegas, 899 F.2d 1324, 1348 (2d Cir.), cert. denied, 498 U.S. 991 (1990).[6]

The issue raised in this appeal is whether any inadequacy in the interpretation of the proceedings "made the trial fundamentally unfair."  See United States v. Tapia, 631 F.2d 1207, 1210 (5th Cir. 1980).  According to the defendant, the trial record "contains a plethora of examples of the defendant's

---

[6] In passing, the defendant asserts that G. L. c. 221, §§ 1-7, in effect, supersede G. L. c. 221, § 92, and Mass. R. Crim. P. 41.  He does not, however, argue that the judge improperly certified the interpreters pursuant to G. L. c. 221, § 92, and Mass. R. Crim. P. 41.  As the defendant contends that the issue is whether he was deprived of his constitutional right to a fair trial due to inadequacies in the interpretation, we need not address the defendant's statutory argument.

struggle to understand what was going on."[7]  The judge, he
alleges, "tolerate[d]" incompetent interpreters for the sake of
expediency, without regard to the defendant's ability to
understand the proceedings.  More particularly, the defendant
argues that the judge erred in finding that (1) the defendant
spoke fluent Cantonese and, therefore, did not need a Taishanese
interpreter; (2) the defendant was able to understand Cantonese
interpreter Liu; and (3) the defendant was able to understand
Taishanese interpreter Moy.  We evaluate each of the defendant's
claims under an abuse of discretion standard.  See Commonwealth
v. Garcia, 379 Mass. 422, 437 (1980) (judgments concerning
defendant's need for interpreter "uniquely within the province
of the trial judge").  See also Valladares v. United States, 871
F.2d 1564, 1566 (11th Cir. 1989) (judge in direct contact with
defendant is given wide discretion to decide adequacy of
interpreter); Chee v. United States, 449 F.2d 747, 748 (9th Cir.

_____

    [7] We have carefully examined the seventy-five instances
cited by the defendant as "examples of the defendant's struggle
to understand what was going on."  These portions of the trial
transcript include counsel's objections, a pause in the trial so
that the interpreter could explain the word "postmortem" to the
defendant, the interpreter asking a witness to clarify the
pronunciation of a surname, and the interpreter indicating that
he could not hear part of an answer.

1971) (per curiam) (trial judge has broad discretion in determining fitness and qualifications of interpreters).[8]

The defendant concedes that he understands "some Cantonese."  He argues, however, that he does not speak Cantonese well enough "to be comfortable understanding it at trial without an interpreter translating."[9]  The judge's finding

_____

[8] In a related claim, the defendant contends that he was deprived of a fair trial by the judge's denial of a continuance prior to beginning cross-examination of Lin on the ninth day of testimony.  Counsel believed that the defendant had prepared certain questions he wanted counsel to ask on cross-examination of Lin.  Before cross-examination began, counsel sought a continuance so that he could review those questions with an interpreter and his client.  The judge denied the motion, pointing to the inconvenience to the jury in dismissing them early, and instructed trial counsel to question Lin for the forty-five minutes remaining in the court day, and then to discuss the questions with the defendant thereafter.  The judge noted also that defense counsel had had nine days to prepare for the cross-examination, and that he had had access to daily transcripts of the majority of the testimony.  In addition, the judge pointed out that the cross-examination was likely to be lengthy, and to continue over more than one day.

According to the defendant, this "showed a total lack of sensitivity to . . . interpretation issues."  The defendant has not shown that the judge abused his discretion in ordering the forty-five minutes of cross-examination before counsel had reviewed the questions that the defendant wanted him to ask. See Commonwealth v. Fernandez, 480 Mass. 334, 340 (2018).  Due to planned delays in the trial, counsel had ample time to consult with the defendant and to prepare his cross-examination of Lin, and was able to resume cross-examination four days later having fully consulted with his client.

[9] While the defendant speaks Cantonese and Taishanese, the two are very different languages.  In general, Cantonese speakers comprehend approximately 31.3 percent of what they hear in Taishanese.  See Szedo, supra at 4.

that the defendant spoke fluent Cantonese, and understood the proceedings interpreted from English into Cantonese, is well supported by the record. Over the course of the four years prior to his trial, the defendant represented to the judge that "his native language is Cantonese." On the fifth day of trial, the judge conducted a colloquy of the defendant, where the defendant withdrew his objections to the Cantonese interpreters. In addition, while seeking a Taishanese interpreter for himself, the defendant also requested that the court assign Cantonese interpreter Lo.[10]

The judge's denial of the defendant's motion to remove Liu, and the judge's decision that Liu was competent, are also well supported by the record and indicate no abuse of discretion. The judge found that Liu is an experienced Cantonese interpreter who has been certified by the office of court administration in New York. He also credited Liu's testimony that she always understood the defendant's Cantonese.

As evidence that Liu was inadequate, on appeal the defendant points to a "serious misinterpretation" of Lin's testimony. On that occasion, the prosecutor asked Lin where the

---

[10] Although not before the trial judge, we note that, in postconviction proceedings, appellate counsel filed a motion for funds to retain the services of an interpreter. Appellate counsel represented that "the defendant does not speak English well and requires the services of a Cantonese or [Taishanese] interpreter in order to communicate with his attorney."

defendant had directed him to go. Lin answered, as interpreted by Liu, "In the beginning he asked me if I knew how to go to Route One and then we would go to" the victim's restaurant. Lin shook his head at this interpretation, and Liu corrected herself, apologizing and asking if Lin had meant the proper name "Kowloon." Lin in fact had said, "In the beginning he asked me if I knew how to go to Route One and then we would go to the Kowloon," an unrelated but well-known restaurant on Route 1. Trial counsel renewed his "motion to have [Liu] stricken as the interpreter." The judge conducted a voir dire; he then credited Liu's explanation that "kowlong" means "dragon" in Cantonese, so she thought Lin had been referring to the victim's restaurant, the name of which included the word "dragon." We discern no basis to disturb the judge's factual finding that there was "absolutely no issue as it relates to [Liu's] ability."

The defendant contends further that the judge erred in finding that Moy was a competent Taishanese interpreter. He argues, "At no time during the trial of this matter did the defendant receive translation from an interpreter capable of speaking Taishanese fluently." The judge made detailed findings regarding the defendant's ability to understand Moy's Taishanese interpretation. He found, for example, that the defendant had no difficulty answering approximately 625 questions posed by his counsel on direct examination. The judge reasoned, "It would

have been impossible for him to have answered those 625 questions . . . if he did not understand the interpretation." The judge noted that the defendant, again with Moy interpreting, had little difficulty understanding the 300 questions asked by the prosecutor on cross-examination.  The defendant has not demonstrated that the judge's findings are erroneous.

b.  Ineffective assistance of counsel.  The defendant claims that a new trial is required because of trial counsel's asserted failures effectively to cross-examine two witnesses.  In his decision on the defendant's motion for a new trial, the motion judge noted that the defendant had not submitted an affidavit from trial counsel or from any other person to provide the court with "specific facts supporting the ineffectiveness claim."  In the judge's view, the defendant's assertions had not "come close to suggesting that he could conceivably overcome the stringent standard of review applied to claims of ineffective assistance because of a failure to impeach a witness" (quotations and citation omitted).[11]  See Commonwealth v. Jenkins, 458 Mass. 791, 805 (2011).

---

[11] The defendant also argues, for the first time on appeal, that he was deprived of effective assistance because trial counsel visited him in jail eighteen times (over a four-year period of pretrial detention), and that an interpreter was present for only eight visits.  Our case law strongly disfavors raising an ineffective assistance claim on direct appellate review because the record is "bereft of any explanation by trial counsel for his actions" (citation omitted).  Commonwealth v.

In reviewing a claim of ineffective assistance in a case of murder in the first degree, we apply the more favorable standard of review for a substantial likelihood of a miscarriage of justice, pursuant to G. L. c. 278, § 33E.  See Commonwealth v. Vargas, 475 Mass. 338, 358 (2016).  "We consider whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion."  Id., quoting Commonwealth v. Lessieur, 472 Mass. 317, 327, cert. denied, 136 S. Ct. 418 (2015).

The defendant contends that Lin's prior statements to police were "vastly different from his testimony at trial," and that trial counsel's failure to impeach Lin with two prior inconsistent statements "may have changed the results of the trial."  The first asserted inconsistent statement concerned Lin's agreement with Sun to split the proceeds of the robbery. In a September 29, 2011 interview, Lin told police that the defendant and Sun returned to the taxicab after their initial

---

Gorham, 472 Mass. 112, 116 n.4 (2015).  To be entitled to relief, "the factual basis of the claim [must] appear[] indisputably on the trial record."  Commonwealth v. Zinser, 446 Mass. 807, 811 (2006).  The defendant does not contend that counsel was unprepared in any manner.  Nor does he explain how he was prejudiced by the lack of an interpreter.  Moreover, the defendant does not mention that the record demonstrates that trial counsel visited the defendant, with an interpreter, an additional forty-two times in the court house holding cell.

entry into the restaurant. Lin said that Sun convinced him to break into the restaurant by telling him, "Just come in to help us. Go inside, get some of the money. I'll split it with you. So, if you don't go inside to help us, you know, the other guy is going to hit you with the crowbar." In a March 10, 2014 interview, Lin denied that Sun had told him there would be money inside the restaurant. In that interview, Lin responded to a question concerning what he knew prior to their arrival at the restaurant. Lin insisted that the defendant and Sun "didn't tell [him] . . . anything until [they got] there." At trial, Lin did not mention any prior agreement to split the proceeds of the robbery.

The second asserted inconsistency involved Lin's statement to police that he had observed "three shadows" behind the restaurant after the defendant and Sun left the taxicab. This statement is inconsistent, the defendant argues, with Lin's trial testimony that only the defendant and Sun were involved in the robbery. As the motion judge recognized, the defendant did not meet the stringent standard required for claims of ineffective assistance premised on a failure to impeach a witness. See Jenkins, 458 Mass. at 805. See also Commonwealth v. Valentin, 470 Mass. 186, 191 (2014) (counsel not ineffective for failing to cross-examine witness concerning particular statement where counsel otherwise "conducted a thorough

impeachment" of witness through cross-examination); <u>Commonwealth</u> v. <u>Fisher</u>, 433 Mass. 340, 347 (2001) ("absent counsel's failure to pursue some obviously powerful form of impeachment . . . , it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion").

Here, trial counsel impeached Lin's credibility in multiple ways, including challenging Lin's statements that he purportedly was unable to communicate with the defendant, that Lin was a heavy gambler, that Lin had attempted to flee the country after meeting with police, and that Lin had negotiated a favorable plea agreement in exchange for his testimony. During cross-examination, Lin admitted that he had lied to the police concerning his involvement in the crime. For example, he falsely told the officers that the defendant forced him to surrender his taxicab keys when they arrived at the restaurant. Lin also said that he had lied about wearing gloves inside the restaurant. In his closing argument, trial counsel pointed out that Lin repeatedly "lied to the police. . . . He lied about the threats from the very beginning." Trial counsel emphasized that Lin "hasn't told the truth in . . . a lot of ways. He started off, as I said, not telling the truth; and he continued."

The defendant also argues that trial counsel's cross-examination of Yusheng Tan (Tan), the defendant's friend from

the casino where the defendant, Sun, and Lin went after the robbery, should have been "more vigorous." Trial counsel's performance was deficient, the defendant argues, because counsel did not mention that Tan told the police that the taxicab was yellow; Tan told the police he was unable to get a good look at the driver; and Tan testified that the defendant's clothing was filthy even though Tan "possibly" did not have a chance to observe the defendant, who was "sandwiched between two other individuals" in the back seat of Lin's taxicab.

The defendant has not demonstrated that the absence of these relatively minor issues from counsel's cross-examination amounted to ineffective assistance of counsel. Trial counsel impeached Tan with multiple prior inconsistent statements concerning the sequence of events inside the casino and the defendant's gambling losses. Counsel also raised the issue of bias because the defendant owed Tan, or Tan's mother, a gambling debt. In his closing argument, trial counsel maintained that Tan was untruthful and told a "whopper" of a lie concerning the defendant's gambling losses. On the issue of bias, trial counsel commented, "Is that a bias that he has so that he would frame his testimony against [the defendant]?"

c. Jury instructions. The defendant asserts that the judge provided a number of erroneous jury instructions as to joint venture liability; the merger doctrine; and the duty to

find the highest crime proved beyond a reasonable doubt.
Because the defendant objected at trial, we review for
prejudicial error.  Commonwealth v. Cole, 473 Mass. 317, 321
(2015).

i.  Joint venture liability.  The defendant argues, as he
did at trial, that it was error for the judge to instruct the
jury on joint venture liability.  He contends that the
Commonwealth prosecuted the case on a theory of principal
liability and did not argue, or establish, that the defendant
aided and abetted another in the commission of the crime.

This argument mischaracterizes the Commonwealth's trial
strategy.  The prosecutor's opening statement reflected the
Commonwealth's position that the defendant, Sun, and Lin
together committed the crime.  She stated that the three men

> "brutally beat [the victim].  They demanded that he open
> the safe and give them money, that [the defendant] armed
> himself with a crow bar and a hammer and that he used that
> to beat [the victim] over and over again, that [Sun] was
> armed with a knife, and that they beat [the victim] so
> badly after having bound him and dragged him and demanded
> from him, that he eventually collapsed.  And the three men
> left him dead or dying on that office floor and fled back
> into the night the same way they came."

In her closing argument, the prosecutor continued to maintain
that the defendant, Sun, and Lin robbed and killed the victim:
"Three men assaulted [the victim] and tried to rob him.  Three
men confined him, put him in fear while they tried to steal from

him.  And three men brutally murdered [him].  But you are here to render a verdict as to just one, [the defendant]."

The judge properly instructed the jury on the theory of joint venture liability.  See Commonwealth v. Smith, 460 Mass. 385, 389 (2011) (judge required to instruct on elements of joint venture where supported by evidence).  "There is no requirement that the Commonwealth prove precisely what role the defendant played -- whether he acted as a principal or an accomplice (or joint venturer)."  Commonwealth v. Silva, 471 Mass. 610, 621 (2015).  To support a conviction as a joint venturer, the Commonwealth was required to prove, beyond a reasonable doubt, that the defendant "knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense."  Commonwealth v. Zanetti, 454 Mass. 449, 468 (2009).  Here, there was ample evidence that the defendant knowingly participated with others in the robbery and beating, with the requisite intent.[12]  See Commonwealth v. Horne, 466 Mass. 440, 446-447 (2013).

---

[12] The defendant's claim that he was prejudiced by the portion of the judge's instructions referencing the crime of conspiracy is unavailing.  The judge instructed the jury that they could consider statements made that were attributed to Sun if the Commonwealth established that the statements were "made during or in furtherance of the joint venture or conspiracy." The defendant objected to the judge's use of the word "conspiracy."  He argued that conspiracy is a separate crime and had the potential to inject "something into the case that wasn't there."  In response, the judge explained to the jury that his

ii.  <u>Instruction on merger</u>.  The trial judge instructed the jury on the felony-murder merger doctrine that "[t]he act of violence that is an element of the underlying felony of stealing by confining or putting in fear may not be the same act that caused the victim's death.  Where an act of violence is an element of the underlying felony, you may find felony murder only if you find an act that is separate and distinct from the violent act that resulted in [the victim's] death."  See <u>Commonwealth</u> v. <u>Gunter</u>, 427 Mass. 259, 272 (1998) (merger doctrine limits application of felony-murder rule).  The defendant objected to this instruction.

The defendant contends on appeal that the merger doctrine precluded a conviction of felony-murder because more than one person struck the victim during the robbery, and the medical examiner could not isolate the cause of death to any one injury. He argues, "[I]f more than one person was involved and there is no proof as to what [the victim] died from, then there can be no

---

use of the word conspiracy was limited to their consideration of the statements by Lin and Sun.  He emphasized, "Obviously, there is no separate indictment or crime before you alleging conspiracy."  We presume that the jury understood and followed the judge's instruction. <u>Commonwealth</u> v. <u>Maynard</u>, 436 Mass. 558, 570-571 (2002).

conclusion that the defendant was part of what resulted in [the victim's] death."[13]

The merger doctrine is inapplicable, however, "where the predicate felony has an intent or purpose separate and distinct from the act causing physical injury or death."  Commonwealth v. Morin, 478 Mass. 415, 431 (2017).  It is well established that the merger doctrine does not apply to the predicate felony of robbery, where that predicate felony plainly has a purpose separate and distinct from the acts that caused the victim's death.[14]  Id., citing Commonwealth v. Christian, 430 Mass. 552,

---

[13] On appeal, the defendant argues also that one of the judge's instructions misstated the facts. The judge instructed,

> "In this case, the Commonwealth alleges the following separate and distinct acts, that the defendant, allegedly as an aider and abetter, bound [the victim], brought [him] to a safe, put a knife to or close to [his] neck, struck [his] legs before [he] was brought to the safe and/or stepped on [his] upper thigh."

The defendant contends that "[t]here was no evidence at trial that the defendant [as opposed to Sun] . . . used a knife against [the victim]."  Contrary to the defendant's argument, this instruction did not inform the jury that the defendant held a knife to the victim's throat; the instruction plainly referred to the defendant's participation "as an aider and abetter" in the robbery with Sun and Lin.

[14] Moreover, if the jury convict a defendant on two theories of murder in the first degree, the verdict "will remain undisturbed even if only one theory is sustained on appeal." Commonwealth v. Nolin, 448 Mass. 207, 220 (2007), citing Commonwealth v. Chipman, 418 Mass. 262, 270 n.5 (1994).  As the jury convicted the defendant of murder in the first degree on a theory of extreme atrocity or cruelty, we could affirm the verdict without reaching the defendant's contention that the

556 (2000). See Commonwealth v. Fredette, 480 Mass. 75, 81 (2018); Commonwealth v. Holley, 478 Mass. 508, 520 (2017).

iii. Highest crime. The judge instructed the jury that they had a duty to find the defendant guilty of the most serious offense the Commonwealth proved beyond a reasonable doubt. He also instructed, "If the evidence does not prove beyond a reasonable doubt that the defendant is guilty of any offense or offenses charged, you must find him not guilty." The defendant contends that these instructions violated the language of G. L. c. 265, § 1, which provides that "[t]he degree of murder shall be found by the jury."

There was no error. See Commonwealth v. Dickerson, 372 Mass. 783, 797 (1977). It is well settled that a judge may, in the exercise of discretion, inform the jury of their duty to return a verdict for the most serious crime proved against the defendant beyond a reasonable doubt. See, e.g., Commonwealth v. Nelson, 468 Mass. 1, 16-17 (2014); Commonwealth v. Rivera, 445 Mass. 119, 131 (2005); Model Jury Instructions on Homicide 107 (2018); Model Jury Instructions on Homicide 93-94 (2013).

d. Walker method. The defendant argues that the judge abused his discretion in denying the defendant's request for

---

felony-murder conviction is precluded by the merger doctrine. See Commonwealth v. Pytou Heang, 458 Mass. 827, 860 n.36 (2011), and cases cited.

the Walker method of jury selection.  Under the Walker method,
the parties do not begin to exercise peremptory challenges until
the number of members of the venire found indifferent equals the
total number of all peremptory challenges that may be exercised
by all the parties plus the number of indifferent jurors and
alternates needed to serve.  Walker, 379 Mass. at 299 n.1.
The Walker method affords the parties the benefit of exercising
peremptory challenges based on the selection of the jury as a
whole instead of piecemeal.  See P.M. Lauriat & D.H. Wilkins,
Massachusetts Jury Trial Benchbook § 3.1.4.4, at 107-108 (4th
ed. 2019) (Lauriat & Wilkins) (Walker method "allows the parties
to identify and evaluate the entire pool of jurors from which
the final jury will be selected").

     Although he acknowledged the value of the Walker method,
the judge denied the defendant's request to empanel using
the Walker method.  The judge explained that, given the number
of days anticipated for empanelment, the court did not have the
resources available to accommodate the defendant's request.
Instead, the judge required the exercise of peremptory
challenges after sixteen members of the venire had been found
indifferent.  As the defendant objected to the judge's ruling,
we review for prejudicial error.  Cole, 473 Mass. at 321.

     The defendant argues that the judge violated then-existing
Rule 6 of the Rules of the Superior Court, which "expressly

provide[d] that peremptory challenges start after 'the full number of [jurors] is obtained.'"[15]  He contends that the judge improperly chose "speed" over "fairness."

In Commonwealth v. Johnson, 417 Mass. 498, 506-508 (1994), we rejected the argument that the Walker method is required, and see no reason to disturb this precedent.  "While the Walker method of jury challenging may be a desirable strategic tool . . . [,] in cases such as this where the total number of peremptory challenges is great, the Walker method is likely to be inefficient and unworkable.  In any case, use of the Walker method is not mandated by rule 6."  Id. at 507-508.  See Lauriat

_____

[15] At the time of the defendant's trial, in 2016, Rule 6 of the Rules of the Superior Court provided in part:

"The procedure in the matter of peremptory challenges of jurors, except when an individual voir dire is conducted, shall be as follows, unless specially otherwise ordered in a particular case.  The juror shall first be called until the full number is obtained. . . .  When it has been determined that all the jurors stand indifferent in the case, each plaintiff shall at one time exercise his right of peremptory challenge as to such jurors, and after others have been called to take the places of those challenged, and it has been determined that they stand indifferent in the case, shall at one time exercise his right of challenge of such others, and so on until he has exhausted his right of peremptory challenge or has ceased to challenge."

Rule 6 of the Rules of the Superior Court, Massachusetts Rules of Court, at 1693 (Thomson Reuters 2015).  Rule 6 was amended on July 26, 2017, effective September 1, 2017, to provide for attorney-conducted voir dire.  Commonwealth v. Dabney, 478 Mass. 839, 848-849, cert. denied, 139 S. Ct. 127 (2018).  See G. L. c. 234A, § 67D; St. 2016, c. 36, § 4; St. 2014, c. 254, § 2.

& Wilkins, supra at 107 ("The Walker method is not mandated by Superior Court Rule 6 . . .").

e. Break in trial due to judge's vacation. The defendant argues that a one-week delay occasioned by the judge's vacation created a substantial likelihood of a miscarriage of justice. The delay, according to the defendant, "negatively impacted the jurors," to his detriment. Because the defendant did not object to the delay at trial, we review to determine whether any error resulted in a substantial likelihood of a miscarriage of justice. Commonwealth v. Wright, 411 Mass. 678, 681-682 (1992), S.C., 469 Mass. 447 (2014).

The judge began to empanel the jury on March 8, 2016, and the jury returned its verdict on May 18, 2016. On the first day of trial, the judge informed counsel of particular days that he was not available, which included a pre-planned vacation during the week of April 18-22, 2016. During jury selection, the judge told the members of the venire that it was difficult to estimate the length of the trial, but that the court would not be in session during the week of April school vacation. At individual voir dire, the judge asked each potential juror whether the trial schedule posed a substantial hardship. All of the seated jurors responded that it did not.

Having been informed of the schedule, the jurors certainly were not surprised by the one-week delay that indeed took place

during the nearly three-month trial, and the defendant has not shown that any of the jurors were upset with this break in the lengthy proceedings. Moreover, trial counsel did not object to the schedule or raise a concern about the possible negative impact on the jury. The defendant's posttrial arguments to the contrary are speculative at best.

f. Colloquy before defendant testified. In the only issue on appeal that the defendant did not raise in his motion for a new trial, the defendant contends that the judge should have, but did not, sua sponte conduct a colloquy of the defendant before he testified, to ensure that the defendant knowingly and voluntarily had waived the privilege against self-incrimination when he took the witness stand. The defendant argues that the judge was aware of the defendant's history of mental illness, the tensions between the defendant and trial counsel, and difficulties with the interpreters. The defendant contends that it was not clear that he voluntarily, knowingly, and intelligently waived his right against self-incrimination.

"A criminal defendant must decide whether to testify, as is the defendant's constitutional right, or not to testify, which is also a constitutional right." Commonwealth v. Ramirez, 407 Mass. 553, 556 (1990). It is an important strategic decision made with the advice of counsel. Commonwealth v. Waters, 399 Mass. 708, 716 (1987). "It must be intelligently and

voluntarily made, with sufficient awareness of the relevant circumstances and likely consequences" (quotation and citation omitted).  Commonwealth v. Medina, 64 Mass. App. Ct. 708, 723 (2005).

The judge was not required to engage in a colloquy with the defendant to determine whether he voluntarily, knowingly, and intelligently waived his right not to testify.  See Ramirez, 407 Mass. at 556 ("there is no requirement in this Commonwealth that the trial judge engage in a colloquy with the defendant personally about the defendant's participation in the decision whether to testify").  See also Commonwealth v. Smith, 456 Mass. 476, 481 (2010) (whether to conduct colloquy on defendant's decision not to testify is within judge's discretion); Commonwealth v. Glacken, 451 Mass. 163, 170 (2008) (trial judge need not determine whether defendant knowingly and voluntarily waived right to testify).

g.  Relief under G. L. c. 278, § 33E.  We have carefully reviewed the entire record, pursuant to G. L. c. 278, § 33E, and discern no reason to order a new trial or to reduce the degree of guilt.  The defendant's convictions and the order denying his motion for a new trial are affirmed.

So ordered.